**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| PERSONALWEB TECHNOLOGIES, LLC.<br>AND LEVEL 3 COMMUNICATIONS, LLC, | § | |
| | § | Civil Action No. 6:11-cv-00655 (LED) |
| Plaintiffs, | § | |
| | § | JURY TRIAL DEMANDED |
| v. | § | |
| | § | |
| NEC CORPORATION OF AMERICA, INC., | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| PERSONALWEB TECHNOLOGIES, LLC.<br>AND LEVEL 3 COMMUNICATIONS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 6:11-cv-00656 (LED) |
| | § | |
| GOOGLE INC. AND YOUTUBE, LLC. | § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| PERSONALWEB TECHNOLOGIES, LLC.<br>AND LEVEL 3 COMMUNICATIONS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 6:11-cv-00657 (LED) |
| | § | |
| NETAPP, INC. | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| PERSONALWEB TECHNOLOGIES, LLC. AND LEVEL 3 COMMUNICATIONS, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:11-cv-00658 (LED) |
| AMAZON.COM, INC.; AMAZON WEB SERVICES LLC; AND DROPBOX, INC., | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § | |

| | | |
|---|---|---|
| PERSONALWEB TECHNOLOGIES, LLC. AND LEVEL 3 COMMUNICATIONS, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:11-cv-00660 (LED) |
| EMC CORPORATION AND VMWARE, INC., | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

| | | |
|---|---|---|
| PERSONALWEB TECHNOLOGIES, LLC. AND LEVEL 3 COMMUNICATIONS, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:11-cv-00683 (LED) |
| AUTONOMY, INC., HEWLETT-PACKARD COMPANY, AND HP ENTERPRISE SERVICES, LLC, | § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC AND LEVEL 3 COMMUNICATIONS, LLC, | § § § |
| Plaintiffs, | § § |
| v. | § § Civil Action No. 6:12-CV-00658-LED |
| YAHOO! INC. | § § JURY TRIAL DEMANDED |
| Defendant. | § § § |

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC AND LEVEL 3 COMMUNICATIONS, LLC, | § § § |
| Plaintiffs, | § § |
| v. | § § Civil Action No. 6:12-CV-00660-LED |
| APPLE INC. | § § JURY TRIAL DEMANDED |
| Defendant. | § § § |

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC AND LEVEL 3 COMMUNICATIONS, LLC, | § § § |
| Plaintiffs, | § § |
| v. | § § Civil Action No. 6:12-CV-00662-LED |
| FACEBOOK INC. | § § JURY TRIAL DEMANDED |
| Defendant. | § § § |

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC AND LEVEL 3 COMMUNICATIONS, LLC, Plaintiffs, v. MICROSOFT CORPORATION Defendant. | § § § § § § § § § § § § Civil Action No. 6:12-CV-00663-LED JURY TRIAL DEMANDED |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

I.      PRELIMINARY STATEMENT .................................................................................1

II.     BACKGROUND OF THE "TRUE NAME" PATENTS .................................................3

III.    DISCUSSION OF DISPUTED CLAIM CONSTRUCTIONS...........................................6

        A.      "Substantially Unique Identifier" and Related Terms .............................6

                1.      "Substantially Unique Identifier," "Data Identifier" and "True
                        Name" Are Synonyms for the Instrument Used by the Alleged
                        "True Name" Invention To Identify and Access Data Items ......................6

                        a)      Accessing a Data Item Is a Key Function of the True Name...........6

                        b)      The Substantially Unique Identifier for a Data Item Is
                                Generated Using an Algorithm That Makes It Substantially
                                Unique to That Data Item ..................................................8

                        c)      "Data Identifier" and "True Name" Are Equivalent to
                                "Substantially Unique Identifier" and All Bear the Same
                                Construction ...................................................................9

                2.      "Data Item Identifier" and "Digital Identifier" Are Also Synonyms
                        for "Substantially Unique Identifier" .........................................10

                        a)      The Specification Supports Defendants' Proposed
                                Constructions ................................................................11

                        b)      PersonalWeb Represented to the PTAB that the Disputed
                                Claim Terms Are "Substantially Unique Identifiers" ...................12

                        c)      The Applicants' Lexicography Requires Defendants'
                                Proposed Construction .....................................................13

                        d)      The Claim Language Does Not Support PersonalWeb's
                                Proposed Constructions ....................................................15

                3.      "Identifier" as Used in "Substantially Unique identifier" In the
                        '791 Patent ...............................................................................16

        B.      Means-Plus-Function Limitations...........................................................19

                1.      "Access Means …" ...................................................................19

2.      "Data Associating Means …"........................................................................20

3.      "Existence Means …".................................................................................22

4.      "Local Existence Means …".......................................................................24

5.      "Identity Means …"....................................................................................27

C.      Additional Terms .................................................................................................29

1.      "Data Item(s)".............................................................................................29

2.      "Data File(s)" and "Files"..........................................................................30

3.      "File System" .............................................................................................33

4.      "Sufficient Number of Copies"..................................................................34

5.      "Licensed" and "Unlicensed" ...................................................................35

6.      "Distributing a Set of Data Files Across a Network of Servers"...............37

IV.     CONCLUSION...................................................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Advanced Display Technologies of Texas, LLC v. AU Optronics Corp.*,
   Nos. 6:11-CV-011, 6:11-CV-391- LED,
   2012 WL 2872121 (E.D. Tex. July 12, 2012) ......................................................... 19

*AFG Indus., Inc. v. Cardinal IG Co.*,
   239 F.3d 1239 (Fed. Cir. 2001) ............................................................................. 11

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ............................................................................. 12

*Anascape, Ltd. v. Nintendo of America, Inc.*,
   601 F.3d 1333 (Fed. Cir. 2010) ............................................................................. 12

*Ergo Licensing LLC v. CareFusion 303, Inc.*,
   673 F.3d 1361 (Fed. Cir. 2012) ............................................................................. 20

*In re Katz Interactive Call Processing Patent Litig.*,
   639 F.3d 1303 (Fed. Cir. 2011) ............................................................................... 3

*Lockheed Martin v. Space Sys./Loral, Inc.*,
   324 F.3d 1308 (Fed. Cir. 2003) ...................................................................... 24, 27

*Lucent Techs., Inc. v. Gateway, Inc.*,
   525 F.3d 1200 (Fed. Cir. 2008) ............................................................................. 38

*My Mail, Ltd. v. Am. Online, Inc.*,
   476 F.3d 1372 (Fed. Cir. 2007) ............................................................................... 8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008) ............................................................................. 38

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... 14, 37

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ............................................................................. 12

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ............................................................................... 18

*USHIP Intellectual Properties, LLC v. United States*,
   714 F.3d 1311 (Fed. Cir. 2013) ............................................................................. 18

## OTHER AUTHORITIES

Office Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012) .................................... 20

## REGULATIONS

37 C.F.R. § 42.100(b) .............................................................................................................. 2, 20

# I.    PRELIMINARY STATEMENT

The "True Name" Patents-in-Suit,[1] which share a common specification,[2] purportedly disclose and claim a specific way to locate and access data in a distributed file system with DNA-like "True Name" identifiers instead of traditional user-generated file names.  Analogous to a DNA sample, the patented system generates a "True Name" for each data item by applying an algorithm to all of the data in the data item (and only that data).  The algorithm generates a True Name that is virtually guaranteed to uniquely represent only that data item.  *See* '791 Patent at 12:54 – 13:9.  According to the patents, this True Name (also called a "substantially unique identifier" and other synonyms in the patents) is used to access a specific data item from a large set of data items.

The common patent disclosure further teaches that the True Name is used to navigate a True File Registry to access a data item.  Each record in the True File Registry lists the physical location of a data item and its corresponding True Name.  *See* '791 Patent, Fig. 4 and 9:36 – 10:10.  To access a data item, a computer searches the True File Registry for the True Name of the data item and then accesses the physical location corresponding to that data item.  *See id.*

---

[1] Pursuant to the Docket Control Orders in the above-captioned cases, the Defendants submit this consolidated brief in response to PersonalWeb's Opening Claim Construction Brief ("Pl. Op. Br."), and in support of the Defendants' proposed constructions of the disputed terms in U.S. Patent Nos. 5,978,791 ("'791 Patent"), 6,415,280 ("'280 Patent"), 6,928,442 ("'442 patent"), 7,802,310 ("'310 Patent"), 7,945,539 ("'539 Patent"), 7,945,544 ("'544 Patent"), 7,949,662 ("'662 Patent"), 8,001,096 ("'096 Patent"), and 8,099,420 ("'420 Patent") (collectively, "Patents-in-Suit" or "True Name Patents").  To the extent a particular patent or claim has not been asserted against a particular Defendant, that Defendant takes no position as to those claim terms' constructions.  In addition, individual Defendants do not join in the briefing for all claim terms; some Defendants have taken no position, or have proposed that no construction is necessary, as reflected in the Amended Joint Claim Construction and Prehearing Statement,  Ex. B (*e.g.*, CA No. 6:12cv663, Dkt. No. 65) (hereafter "JCCS").

[2] PersonalWeb's Opening Markman Brief cites only to the specification of the '791 Patent, with occasional parallel citations to the '539 specification, which PersonalWeb acknowledges is identical to the '791 specification. *See* Pl. Op. Br. at p. 13, n. 6.

PersonalWeb – whose owners had nothing to do with the purported inventions at issue and only recently acquired ownership of the patents – now seeks to use claim construction to expand the scope of the claims substantially beyond the specific True Name invention purportedly disclosed nearly two decades ago. PersonalWeb's proposed constructions untether claim term after claim term from the intrinsic record in its effort to cover a wide variety of software and hardware that identify, locate and access data items through well-known, traditional methods – including the same ***context-dependent*** names and/or offsets that the patents explicitly distinguished.[3] Many of the claim terms for which PersonalWeb seeks broad constructions cannot be found anywhere in the common patent specifications. They exist now only because of an ongoing continuation practice whereby these superficially different claim terms crept their way into the patent claims. PersonalWeb conveniently ignores the specification, file histories and other PTO proceedings in an attempt to parlay this continuation strategy into claims completely divorced from the intrinsic record. Indeed, PersonalWeb attempts, without basis, to obtain even broader constructions from this Court than those used by the Patent Trial and Appeal Board ("PTAB") in its recently instituted *Inter Partes* Reviews ("IPRs"), in which the PTAB applied the "***broadest reasonable*** interpretation in light of the specification." *See, e.g.,* Ex. D, '791 IPR Dec. at 12 (emph. added);[4] *see also* 77 Fed. Reg. 48,680, 48,727 (Aug. 14, 2012) (to be codified at 37 C.F.R. § 42.100(b)).

Simply put, the Court should reject PersonalWeb's effort at using claim construction to expand the scope of these claims. As proposed by Defendants, the Court's constructions should

---

[3] Moreover, as noted in the pending *Inter Partes* Review proceedings, **content-dependent** identifiers were also well known in the prior art before the claimed invention. *See infra*.

[4] References herein to "Ex. _" are to the Exhibits to the Declaration of Phillip J. Haack, submitted concurrently herewith.

recognize the express characteristics of a True Name and other identifiers; namely the ability to access a data item using a substantially unique identifier generated from applying an algorithm to all of the data in the data item and only the data in the data item.

## II. BACKGROUND OF THE "TRUE NAME" PATENTS

PersonalWeb's "overview" of the nine "True Name" Patents-in-Suit glosses over a key fact: all of these patents share the same written description, differing only in their respective titles and abstracts. Notably, for every asserted claim, PersonalWeb contends that the priority date is April 11, 1995, the date to which the oldest of the Patents-in-Suit (the '791 Patent) claims priority. *See, e.g.,* Ex. N, PersonalWeb's P.R. 3-1 Disclosures (CA No. 6:11cv660), at 4. In reality then, these cases do not involve nine "different" patents, but instead present the Court with claims serially prosecuted in continuation applications spanning over 16 years. The common root of all of the asserted claims necessarily impacts their proper construction.[5]

At the outset of these common patents,[6] the applicants described what they saw as a fundamental problem with prior art data processing systems at the time (April 1995) – namely, that data files were identified only "relative to a specific context" such as the file's location (or user-chosen name) in a particular user's file system. *E.g.,* '791 Patent at 2:12-16. This context-based approach purportedly was undesirable because common file system operations often included multiple copies of the same file, thus increasing the amount of data stored and complicating file management. *Id.* at 2:47-58. The applicants then described their invention in

---

[5] Because they share the same specification, this Court should interpret the disputed terms consistently across the Patents-in-Suit. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011) (citing *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1293 (Fed. Cir. 2005)).

[6] Defendants provide only a brief Background herein, noting that further detail will be provided to the Court in the Technology Tutorial to be submitted to the Court on July 12, 2013.

the very first sentence of the Summary of the Invention:

> This invention provides, in a data processing system, a method and apparatus for identifying a data item [*e.g.*, a file] in the system, where the ***identity of the data item depends on all the data in the data item and only on the data in the data item.*** Thus, the identity of a data item is independent of its name, origin, location, address, or other information not derivable directly from the data, and depends only on the data itself.

'791 Patent at 3:29-35 (emph. added).

As the applicants' chosen moniker "True Name" implies, the purported invention of the Patents-in-Suit was centered and dependent upon creating a "True Name" or "substantially unique identifier" – also referred to in the True Name Patent family by other synonyms – whose purpose is to provide the ability for the associated data item to be uniquely identified and accessed in the type of system described and claimed in the patents. For the substantially unique identifier to perform those key functions, it is created by a process that is at once both (1) content-dependent (uses ***all*** of the data in the data item) and (2) context-independent (uses ***only*** the data in the data item without regard to the context of the data). *Id.*; *see also e.g.*, '791 Patent at 35:29-37. Notably, the specification expressly acknowledges that the ***only*** embodiments described use a "True Name." '791 Patent at 13:55-60. Moreover, the patentees not only emphasized the requirement to generate identifiers using "all" and "only" the underlying data throughout the single common patent specification, but also repeatedly argued during prosecution of the application that issued as the '791 Patent that the claimed "substantially unique identifier" used to identify a data item was not based on something other than the data in the data item, nor could it be based on less than all of the data in the data item. *E.g.*, Ex. B, '791 File History, Aug. 29, 1997 Amend. C, at 9-11.

The True Name is linked to the actual data item by the True File Registry database, which contains, *inter alia*, a "True File ID" that has the "identity or disk location of the actual physical representation of the file or file segment." *E.g.*, '791 Patent at 9:63-67. The patents emphasize the importance of the substantially unique identifier being propagated throughout, and persisting in, the system in a variety of data structures

| Field | Description |
|---|---|
| True Name | computed True Name or identity of the file. |
| Compressed File ID | compressed version of the True File may be stored instead of, or in addition to, an uncompressed version. This field provides the identity of the actual representation of the compressed version of the file. |
| Grooming delete count | tentative count of how many references have been selected for deletion during a grooming operation. |
| Time of last access | most recent date and time the content of this file was accessed. |
| Expiration | date and time after which this file may be deleted by this server. |
| Dependent processors | processor IDs of other processors which contain references to this True File. |
| Source IDs | source ID(s) of zero or more sources from which this file or data item may be retrieved. |
| True File ID | identity or disk location of the actual physical representation of the file or file segment. It is sufficient to use a filename in the registration directory of the underlying operating system. The True File ID is absent if the actual file is not currently present at the current location. |
| Use count | number of other records on this processor which identify this True File. |

True File registry – '791 Patent at 9:41 – 10:10

so that all parts of the system (servers, CPUs, etc.) can uniquely identify and access every data item that has been assimilated into the True Name system. *See, e.g.*, '791 Patent at 32:49 – 38:40 ("The System in Operation"). Thus, the substantially unique identifier (True Name) – rather than some other form of identification such as either (1) a path (or directory) and file name or (2) address, byte offset and number of bytes (*e.g.*, the size of the data item, etc.) – is passed back and forth by parts of the system to request that the associated data item be provided. *Id.*

The True Name or substantially unique identifier is immutable relative to the ***content*** of a particular data item – it never changes unless the content does. And, as importantly, it is immune to ***context***, such as differing computer systems, storage locations, or use by varied software or users. Thus, if something changes other than the content in the data item (for example, the user-given file name), the True Name will ***not*** change. Ex. B, '791 File History, Aug. 29, 1997 Amend. C, at 9-10. But if the data item itself changes (*e.g.*, changing a single word or even a

single character in a document), its True Name *will* change.  *See, e.g.*, *id.* at 9.

## III.  DISCUSSION OF DISPUTED CLAIM CONSTRUCTIONS

### A.  "Substantially Unique Identifier" and Related Terms

| Terms | Defendants' Exemplary Proposed Construction[7] |
|---|---|
| substantially unique identifier / data identifier / True Name | an identifier for access to a data item generated by processing all of the data in the data item, and only the data in the data item, through an algorithm that makes it substantially unique to that data |

The Defendants propose herein an exemplary construction that addresses the fundamental and inherent characteristics of the "substantially unique identifier":  (1) it is generated by using *all* of the data in the data item (*i.e.*, content dependent) and *only* the data in the data item (*i.e.*, context independent); (2) it is used to *access* a data item; and (3) it is generated by using an algorithm that makes it *substantially unique* to that data item (*i.e.*, it is generated to be essentially the data item's DNA).

PersonalWeb and the Defendants agree on the first point, *i.e.*, that the "substantially unique identifier" is "generated by processing all of the data in the data item and only the data in the data item using an algorithm."  *See* JCCS at 15-17; *see also* Pl. Op. Br. at 5-6.  The parties' disagreement relates to the second two points.

### 1.  "Substantially Unique Identifier," "Data Identifier" and "True Name" Are Synonyms for the Instrument Used by the Alleged "True Name" Invention To Identify and Access Data Items

#### a)  Accessing a Data Item Is a Key Function of the True Name[8]

PersonalWeb mischaracterizes Defendants' arguments on the "access" issue.

---

[7] The Defendants have presented slightly different wording in their proposed constructions (*see* JCCS, Ex. B), but agree on the fundamental and inherent characteristics of the "substantially unique identifier" and its synonyms.  Defendants have proposed throughout this briefing exemplary constructions, without waiving their individual proposed constructions as set forth in the JCCS.

[8] EMC and VMware take no position on this issue.

PersonalWeb argues that a True Name / "substantially unique identifier" is not used "only" to "access" a data item, and insists that "the claims and specification describe a variety of possible uses for a 'substantially unique identifier' beyond 'accessing' a 'data item." Pl. Op. Br. at 6. PersonalWeb misses the point. Defendants do not argue that a True Name or substantially unique identifier is used "only" to "access" a data item. It is undisputed that the patent describes using the substantially unique identifier for a variety of file management functions, such as opening, reading, or writing files. '791 Patent at 20:20-21:67. But those functions necessarily involve, at some point, *accessing* the data item – and in the patents, this is done using the True Name. *See, e.g.*, '791 Patent at 20:35–21:20 (operating system mechanism "Open File" will "make a local version of the True File associated with the True Name using the Make True File Local primitive mechanism").

The True Name patents do not teach any embodiment that allows access to a data item *without* using the True Name ("substantially unique identifier"). Rather, the patents' common written description repeatedly emphasizes that the claimed *invention* calls for the "True Name" of a data item as the instrument to be used to "reference and access" that data item. *See, e.g.*, '791 Patent at 6:11-18 (relying on standard file management to store and retrieve data items, but using "the mechanisms of *the present invention* to reference *and access* those data items"); *id*. at 34:9-11 ("In operation data items can be *accessed* by reference to their identities (True Names) independent of their present location."); *id.* at 34:30-32 ("[T]he system provides transparent *access* to any data item by reference to its data identity, and independent of its present location.") (all emph. added). Previously, according to the True Names patents, "[i]n all but the most primitive operating systems," files were identified and located by, e.g., the pathname. *See id.* at 1:23–42. Use of the True Name to access a data item is thus at the core of the claimed invention.

Simply put, the substantially unique identifier or "True Name" must at least be what the invention uses to access a data item. This limitation does not conflict, as PersonalWeb contends, with specific claims to other uses of the substantially unique identifier. *See* Pl. Op. Br. at 13. Rather, its use "for access" is a necessary characteristic, upon which other functionalities could build. PersonalWeb's attempts to run away from this basic tenet only underscore the need for the jury to be instructed accordingly.

> **b)** **The Substantially Unique Identifier for a Data Item Is Generated Using an Algorithm That Makes It Substantially Unique to That Data Item**

Although the parties agree that the construction of "substantially unique identifier" should reflect that it is generated "through an algorithm," PersonalWeb insists that there is no basis for instructing the jury about "how unique the identifier must be." Pl. Op. Br. at 6. But the question of "how unique" the identifier must be to qualify as "substantially unique" – in the face of undisputed facts about how that identifier is determined – is necessarily a question of claim construction that this Court must decide as matter of law. *My Mail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007) (holding that "[b]ecause there is no dispute regarding the operation of the accused systems, that issue reduces to a question of claim interpretation and is amenable to summary judgment").

In that regard, the Court should construe this term to reflect that the "algorithm" cannot be simply any algorithm – rather, the algorithm must be such that it does, in fact, generate an identifier for the data item that is "substantially unique." The intrinsic record explains what it means to be "substantially unique" in the context of the True Name Patents. The written description notes that "[i]t is impossible to define a function having a unique output for each possible input" ('791 Patent at 13:20-21), but explains that the *invention* computes the True Name of a "data block B" using a function (algorithm) "such that the True Name of the data

block is ***virtually guaranteed*** to represent the data block B and only data block B." *Id*. at 12:54-59 (emph. added).[9] The written description satisfies this requirement both by choosing certain algorithms,[10] and by specifying the size of the data processing systems in which they operate.[11]

        c)        **"Data Identifier" and "True Name" Are Equivalent to "Substantially Unique Identifier" and All Bear the Same Construction**

The parties agree that "data identifier"[12] means the same thing as "substantially unique identifier." *See* JCCS, Ex. B, at 11-12. The differences in the proposed constructions for this term result only from their different proposals for "substantially unique identifier," which should be resolved as discussed *supra*.

The patents similarly use "True Name" interchangeably with "substantially unique identifier" and "data identifier." Conspicuously missing from PersonalWeb's brief is any mention that an IPR has been instituted for several of the Patents-in-Suit, in which the PTAB rejected PersonalWeb's contention that "True Name" should be given a narrower construction

---

[9] The only guidance in the specification to answer the question of "how unique" the identifier must be is the "virtually guaranteed" standard that is set forth in the specification. If the Court does not adopt a construction articulating how unique the identifier is, then NetApp has reserved the right to contend that this term is indefinite. Although the specification refers to "different degrees of uniqueness" for "True Names," it does so only in the context of added levels of identification, such as using a "tag, type, category or class of the data item" in ***combination with*** a True Name. '791 Patent at 13:46-67.

[10] '791 Patent at 13:10–14 ("A family of functions with the above properties are the so-called message digest functions, which are used in digital security systems as techniques for authentification [sic] of data. These functions (or algorithms) include MD4, MD5, and SHA.").

[11] '791 Patent at 13:35–45 ("To roughly quantify the probability of a collision, assume that there are no more than $2^{30}$ storage devices in the world . . .").

[12] In the IPR of the '539 Patent, the PTAB rejected the Requestor's and PersonalWeb's construction requiring a "data identifier" to be "generated by processing all of the data in the data item, and only the data in the data item, through an algorithm." Ex. J, '539 IPR Dec. at 11. Significantly, for purposes of IPR, claim terms are "given their broadest reasonable construction." *Id.* at 7. For purposes of litigation, PersonalWeb and Defendants agree that a correct construction of "data identifier" at a minimum requires that it should be generated by processing all of the data and only the data through an algorithm.

than its synonyms.  *See, e.g.*, Ex. D, '791 IPR Dec., at 3 (noting that "substantially unique identifiers" are "otherwise referred to as True Names").  In particular, the PTAB held:

> Upon reviewing the portion of the Specification of the '765 [sic, '791] patent cited by PersonalWeb, we do not find an explicit or special definition for the claim term "True Name."  However, we note that the portion of the Specification of the '765 [sic] patent cited by EMC does provide an explicit or special definition for the claim term "True Name."  Pet. 5-6 (citing to Spec. 6:7-10).  Therefore, we agree with EMC that the claim term "True Name" should be construed as a "substantially unique data identifier for a particular item."

*Id*. at 16.  The portion of the specification "cited by EMC" states simply and unequivocally:  "the terms 'True Name', 'data identity' and 'data identifier' refer to the substantially unique data identifier for a particular data item."  '791 Patent at 6:7-10.  These terms should, therefore, all be construed to have the same meaning, as Defendants propose.

### 2. "Data Item Identifier" and "Digital Identifier" Are Also Synonyms for "Substantially Unique Identifier"[13]

| Terms | Defendants' Exemplary Proposed Construction |
|---|---|
| data item identifier / digital identifier | Same construction as for "substantially unique identifier" – that is, an identifier for access to a data item generated by processing all of the data in the data item, and only the data in the data item, through an algorithm that makes it substantially unique to that data |

PersonalWeb admits that "substantially unique identifier," "data identifier," and "True Name" – the ***only*** disputed identifier terms actually used in the specification – "do[] not have an ordinary meaning" (Pl. Op. Br. at 5, 11, 12) and should be construed to require "processing ***all*** of the data in the data item, and ***only*** the data in the data item, ***through an algorithm***."[14]

---

[13] EMC and VMware take no position on the construction of these terms.

[14] Specifically, PersonalWeb contends that "substantially unique identifier" and "data identifier" should be construed as "an identity for a data item ***generated by processing all of the data in the data item, and only the data in the data item, through an algorithm***."  Pl. Op. Br. at 5, 11-12 (emph. added).  PersonalWeb further proposes that "True Name" should incorporate its construction for "substantially unique identifier" along with additional limitations.  *Id.* at 12.

PersonalWeb reverses course entirely, however, with respect to other identifier terms at issue – "data item identifier" and "digital identifier" – arguing that these terms (nowhere found in the specification) should be given their plain and ordinary meaning. *Id.* at 8, 10. But the specification, the proceedings before the PTO, and applicants' own lexicography compel a construction of "data item identifier" and "digital identifier" that is identical to the other identifier terms that PersonalWeb admits must be construed.[15] Defendants' proposed construction, requiring that the identifier be generated, at least in part, by processing "all" and "only" the relevant data, is the only construction that accomplishes this.[16]

a) **The Specification Supports Defendants' Proposed Constructions**

The specification of the True Name Patents sets forth the "Field of the Invention" as relating "to data processing systems wherein data items are identified by substantially unique identifiers *which depend on all of the data in the data items and only on the data in the data items*." '791 Patent at 1:13-18 (emph. added). The specification does not describe whatsoever an identifier that is consistent with PersonalWeb's construction – that is, an identifier that depends on processing anything less than all and only the underlying data through an algorithm. PersonalWeb does not, and indeed cannot, point to any such identifier or algorithm. In fact, the

_____

[15] Whether the Court adopts PersonalWeb's or Defendants' proposed construction for "substantially unique identifier," Defendants respectfully submit that construction should also be adopted for "data item identifier" and "digital identifier." For the reasons stated herein, "data item identifier" and "digital identifier" must at a minimum require "processing all of the data in the data item, and only the data in the data item, through an algorithm," a limitation that is common to all parties' constructions of "substantially unique identifier" but wholly missing from PersonalWeb's construction for "data item identifier" and "digital identifier."

[16] Because the terms "data item identifier" and "digital identifier" are nowhere mentioned in the specification, this heightens the need for this Court to construe them. PersonalWeb invites legal error by asking the Court to submit these terms to the jury without construction. *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001).

specification expressly acknowledges that the **only** embodiments described use a "True Name." '791 Patent at 13:55-60.

The specification is particularly important where, as here, the "data item identifier" and "digital identifier" only first appeared during the prosecution of two of the True Name Patents in 2010, **over fifteen years after** the alleged priority date of the True Name patents. Ex. L, '096 File History, Apr. 12, 2010 Amend. at 12; *id.*, Nov. 22, 2010 Resp. at 17. Because PersonalWeb contends that every asserted claim in the True Name Patents is entitled to an April 11, 1995 priority date, PersonalWeb must demonstrate that the instant identifier terms find support in the only identifier terms actually described in the original specification – "substantially unique identifier," "data identifier," and "True Name."[17] As PersonalWeb has admitted, these three identifiers must be "generated by processing all of the data in the data item, and only the data in the data item, through an algorithm." In turn, for "data item identifier" and "digital identifier" to find any support in the specification, they must be construed the same way.

> **b)** **PersonalWeb Represented to the PTAB that the Disputed Claim Terms Are "Substantially Unique Identifiers"**

PersonalWeb also fails to account for its arguments to the PTAB that claims containing the newly-minted terms "data item identifier" and "digital identifier" should be limited to the requirements for "substantially unique identifiers." In opposing the request for IPR of claims 1, 2, 81, and 83 of the '096 Patent, all of which recite "data item identifier" or "digital identifier,"

---

[17] *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) ("To satisfy the written description requirement, the missing descriptive matter must necessarily be present in the [original] application's specification such that one skilled in the art would recognize such a disclosure.") (internal citations omitted); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("The purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not; the applicant for a patent is therefore required to 'recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.'" (citation omitted); *Anascape, Ltd. v. Nintendo of America, Inc.*, 601 F.3d 1333, 1339 (Fed. Cir. 2010) ("[A] patentee [is not] presumed to support variants that are not described.").

PersonalWeb attempted to distinguish the asserted prior art from the challenged '096 claims by representing that the claims *require* the "substantially unique identifier" described in the specification:

> There are certain ***fundamental differences*** between the '096 patent and Langer which will be explained more fully below in addressing the challenged claims. For example, ***the '096 patent describes the use of a substantially unique identifier*** (*e.g.*, an MD5 hash, and/or a hash of hashes) as a name of a data item in a computer network, ***where the identifier is determined using all of the data in the data item so that two identical data items in the system will have the same identifier***. In contrast, when Langer provides a name for a package (*e.g.*, ZIP package), Langer's name is ***based on just some of the data*** in the package.

Ex. M, '096 IPR Prelim. Resp. (March 20, 2013) at 10-11 (emph. added). In the same filing, PersonalWeb also proposed a construction for "substantially unique identifier" that must be "generated by processing all of the data in the data item, and only the data in the data item, through an algorithm." *Id.* at 3. By expressly arguing that the challenged '096 claims are novel and nonobvious based on the differences between the "substantially unique identifier" of the specification and the identifier of the cited prior art, PersonalWeb admitted that the recited terms "data item identifier" and "digital identifier" (nowhere found in the specification) must be construed consistently with "substantially unique identifier" (which is disclosed in the specification). PersonalWeb cannot be now permitted to seek a broader construction of those same terms in litigation than it argued to the PTAB during IPR just a few months ago.

> **c)** **The Applicants' Lexicography Requires Defendants' Proposed Construction**

Because the disputed terms "***data item*** identifier" and "***digital*** identifier" appear nowhere in the specification, their construction must be informed by the applicants' use of "data item" and "digital" in the specification. With regard to "data" and "data item," PersonalWeb recognizes that the applicants' lexicography governs:

[T]he terms "*data*" and "*data item*" as used herein refer to sequences of bits. Thus a data item may be the contents of a file, . . . a *digital* message, a *digital* scanned image . . . or any other entity which can be represented by a sequence of bits.

'791 Patent at 1:54-60 (emph. added); Pl. Op. Br. at 14. Thus, if "*data item* identifier" finds any support in the specification at all, it must be given a construction identical to "*data* identifier," a term that PersonalWeb recognizes must be "generated by processing all of the data in the data item, and only the data in the data item, through an algorithm." Pl. Op. Br. at 5, 11. Simply put, the specification makes clear that if the algorithm does not process all of the data in a data item, or if it processes anything but the data in the data item, it cannot be the identifier for that data item. The applicants cannot escape that fundamental concept by inventing new terms in their litigation-inspired continuation applications. Likewise, the applicants' definition further makes clear that the word "digital" – used only four times in the specification – is another word for referring to "data" or "a sequence of bits." *See also* '310 Patent, claim 86 (reciting "digital identifier for a particular sequence of bits"). The disputed term "*digital* identifier" should therefore be given a construction identical to that of "*data* identifier" and "*data item* identifier."

PersonalWeb's argument that Defendants "conflate the meaning of 'substantially unique identifier' and an unrelated term . . . 'data item identifier'" is inapt. *See* Pl. Op. Br. at 11. Defendants do not equate "substantially unique" and "data item" as PersonalWeb contends. Instead, analyzed properly, it is the applicants' lexicography of "data item," "digital," and "data" that requires "*data item* identifier" and "*digital* identifier" have the same meaning as "*data* identifier," a term that PersonalWeb admits requires "processing all of the data in the data item, and only the data in the data item, through an algorithm." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) ("[T]he inventor's lexicography governs.").

**The Claim Language Does Not Support PersonalWeb's Proposed Constructions**

Having ignored the specification, the intrinsic record before the PTO, and the applicants' lexicography, PersonalWeb can argue only that Defendants' proposed constructions are somehow inconsistent with claim language requiring that the "data item identifier" and "digital identifier" be based "at least in part" on the underlying data. Pl. Op. Br. at 8, 10. But this argument is belied by the appearance of both "True Name" and "data identifier" in a number of claims that include the "at least in part" language. For example:

- '539 Patent, claim 8 recites "said *data identifier* being *based at least in part on a second function* of said multiple content-based part identifiers";

- '539 Patent, claim 21 recites "said first *data identifier* is *based, at least in part, on a second given function* of data comprising the plurality of segment identifiers"; and

- '442 Patent, claims 13 and 38 recite "the *True Name* being *based at least in part* on a given function of the data."

PersonalWeb agrees that the constructions of "True Name" and "data identifier" include "processing all of the data in the data item, and only the data in the data item, through an algorithm." *See* Pl. Op. Br. at 5, 11, 12. But PersonalWeb cannot explain why its constructions of "True Name" and "data identifier" happen to be consistent with claims in which the "at least in part" language appears, whereas Defendants' similar constructions of "data item identifier" and "digital identifier" are somehow inconsistent with the "at least in part" language of the claims in which those two terms appear.

Furthermore, the above claims and the claims that PersonalWeb points to in its brief are all consistent with the specification. It is unavoidable that "data item identifier" and "digital identifier" must be construed to require processing "all of the data in the data item, and only the data in the data item" through an algorithm. Even when the specification references other information related to a data item, it does so only in the context of added levels of identification

in combination with a True Name, which the parties agree is based on all the data and only the data. '791 Patent at 13:55-14:12. The portion of Defendants' construction concerning "all of the data in the data item and only the data in the data item" reflects what must always take place. The additional language in the claim – "at least in part" – reflects only that these specific claims allow a later step. It does not indicate that an identifier (such as a "True Name," "digital identifier," or "data item identifier") can be based on anything less than processing all of the data in the data item, and only the data in the data item.[18] Thus, viewed in light of this disclosure, there is nothing inconsistent between Defendants' constructions of "data item identifier" and "digital identifier" (and, hence PersonalWeb's own constructions of synonym terms) and the "at least in part" language of the claims.

### 3. "Identifier" as Used in "Substantially Unique identifier" In the '791 Patent[19]

Based on specific prosecution history statements and disclaimers made by PersonalWeb

---

[18] Defendants direct the Court's attention to the '791 File History, the earliest of the True Name patents, where the applicants distinguished their purported file-naming invention – where "a data item A-1 is given a name (true name) A-2 by passing the data item through a function MD, where MD uses all of the data in the data item A-1 and only the data in data item A-1 to determine the name A-2" – from the prior art where a name "is determined by taking the name B-3 of the source file B-4 and concatenating that with a hash of **some** of the contents of the source file B-4." *See* Ex. A, '791 File History, Amend. B at 22 & Figure (emph. in original). Applying a hash to only "some" of the content – as opposed to all and only the content, as Defendants propose – is not within the scope of the original invention. PersonalWeb's proposal – that one may obtain a "data item identifier" or "digital identifier" by applying an algorithm to only **part** of the data in the data item, *see* Pl. Op. Br. at 8, 10, was disclaimed **by the applicants** during prosecution.

[19] NetApp and Amazon are the only parties proposing this construction. Because "identifier" has a readily understood plain and ordinary meaning and because it appears in a number of other claim terms that are being separately construed, Defendants Apple Inc.'s, HP's, Autonomy's and NECAM's position is that "identifier" does not require construction. EMC and VMware do not join this construction. Defendants Google and YouTube maintain that "identifier" must be construed the same as "substantially unique identifier," at least because "the identifier" in the '791 claims (*e.g.*, claims 30-32, 35) has its antecedent basis to "a substantially unique identifier," and thus should have the same meaning.

regarding the '791 Patent, the term "**identifier**" – as used in the phrase "substantially unique identifier" in the claims of the '791 Patent – must be construed to mean "**a name or a substitute for a name for a data item for use in a computer network**."[20]

According to the specification, "[u]sers typically identify data in the [prior art] data processing system[s] by giving the data some form of name" and "[i]n all but the most primitive operating systems, users and programs are able to create and use collections of named data items, these collections themselves being named by identifiers." '791 Patent at 1:23-35. In these conventional file systems, the "names or identifiers" were context-specific with "no direct relationship between the data names and the data item." *Id.* at 1:65-2:16. The alleged invention used *content*-dependent (rather than *context*-dependent) identifiers as these file system names. *Id.* at 35:29-37.

During prosecution of the '791 Patent, the applicants used the terms "identifier" as "a substitute for a name."[21] Then, during the IPR of the '791 Patent, PersonalWeb argued that the result of the hash algorithm of a prior art reference (the Woodhill prior art) was not the "identifier" of the '791 Patent claims because that algorithmic result did not serve as a "name or substitute for a name" in a computer network:

> The '791 patent describes the use of a substantially unique identifier as a name of
> a data item in a computer network. In contrast, while Woodhill uses a hash
> algorithm, it is not used as a file name or as a substitute for the file name . . . This

---

[20] To be clear, this section is directed only to the '791 Patent because it is based on prosecution specific to that patent. Further, NetApp and Amazon have slightly modified the construction they proposed in the JCCS to include "or a substitute for a name" to track PersonalWeb's IPR statements.

[21] *See* Ex. B, '791 File History, Aug. 29, 1997 Amend. C, at 10 ("Using the present invention, a substantially unique identifier is determined for a data item, regardless of any other ***names (identifiers)*** the data item may have. Further the substantially unique identifier is determined for the data item, regardless of any ***names (identifiers)*** or the contents of any other data or data items. Note that a data item may have ***other names, i.e., names other than the substantially unique identifier***.") (underlining in original; other emphasis added).

17

fundamental difference results in numerous differences between Woodhill and the challenged claims.

Ex. C, '791 IPR Prelim. Resp. at 35. While the result of Woodhill's algorithm will provide some value – as any hash algorithm will – that value (according to PersonalWeb) is not an "identifier" **unless it is used** as a name or substitute for a name for the data item in the computer network.[22] Therefore, PersonalWeb deliberately and unambiguously disclaimed any interpretation of "identifier" that is not a name or substitute for a name. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) ("We conclude that Saffran's statements during prosecution of the '760 patent limit 'device' to a continuous sheet. On multiple occasions during prosecution, Saffran sought to distinguish prior art by representing to the examiner that '[t]he device used is a sheet rather than a pre formed chamber (Gaskill).'"); *see also USHIP Intellectual Properties, LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("The fact that the applicant may have given up more than was necessary does not render the disclaimer ambiguous. The analysis focuses on what the applicant said, not on whether the representation was necessary or persuasive . . .").

PersonalWeb objects to the recitation of "for use in a computer network" in the construction of "identifier," arguing that the identifier can be used "in a computer network or even on a single computer." Pl. Op. Br. at 7-8. The relevant claims of the '791 Patent are explicit, however, that the "identifier" is used within a "data processing system" or "among a plurality of locations," and not within a "single computer." *See, e.g.*, '791 Patent, claims 1, 30, 33, 35, 36, 38, 40, and 46. Indeed, as discussed above, PersonalWeb argued during the IPR that

---

[22] Thus, unless the output of an algorithm is used by the system to call or otherwise access a data item, *i.e.*, is used as a name or substitute for a name, such an output is not an identifier.

the identifier is "a name of a data item *in a computer network.*"  *See* Ex. C, '791 IPR Prelim. Resp. at 35.

**B.     Means-Plus-Function Limitations**

**1.     "Access Means …"**

Defendants and PersonalWeb agree that the claimed **function** for this means-plus-function limitation is "**accessing a particular data item using the identifier of the data item**." Defendants propose as an exemplary construction the following corresponding **structure**:  "**The processor of Fig. 1(b), storing the True File Registry and programmed to execute the "Make True File Local" primitive mechanism depicted in Figures 17(a) and 17(b).**"[23]

PersonalWeb erroneously urges this Court to find the structure corresponding to this function to include any "one or more" of a long list of  mechanisms because "[t]he specification lists many mechanisms, including primitive mechanisms, operating system mechanisms, remote mechanisms, background mechanisms, and extended mechanisms, that contain mechanisms for performing the recited function."  *See* Pl. Op. Br. at 23.  This is not the appropriate inquiry. Rather, "[t]he focus of the 'corresponding structure' inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is 'clearly linked or associated with the [recited] function.'"  *See Advanced Display Technologies of Texas, LLC v. AU Optronics Corp.*, Nos. 6:11-CV-011, 6:11-CV-391- LED, 2012 WL 2872121, at *3 (E.D. Tex. July 12, 2012) (citing *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001)).  The appropriate corresponding structure is not a collection of random disclosures, but rather, a "step-by-step procedure for accomplishing a given result" given in "understandable terms."  *Ergo Licensing LLC v. CareFusion 303, Inc.*, 673

---

[23] EMC and VMware would have no objection to the Court, alternatively, adopting the PTAB's construction, which is consistent with the Defendants' proposed construction and specifically references steps S292 and S294 of Figure 17(a).

F.3d 1361, 1365 (Fed. Cir. 2012) (internal citations omitted). PersonalWeb fails to explain how its selections constitute "step-by-step" algorithms that perform the claimed functions.

In fact, the PTAB recently rejected PersonalWeb's proposed construction – the same one it urges here – in the ongoing IPR of the '791 Patent. *See* Ex.D, '791 IPR Dec., at 25-26; Ex. C, '791 IPR Prelim. Resp., at 8-9. Further, the PTAB construed the term under its "***broadest*** reasonable interpretation" to be "a processor programmed according to steps S292 and S294 illustrated in Figure 17(a)." *See* Ex. D, '791 IPR Dec., at 26; s*ee also* 77 Fed. Reg. 48,680, 48,727 (Aug. 14, 2012) (to be codified at 37 C.F.R. § 42.100(b)); Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("[T]he Board will apply the broadest reasonable interpretation standard during IPR … ."). In so doing, the PTAB confirmed that the structure includes ***at minimum*** the relevant steps set forth in Figure 17(a) of the '791 Patent including "look[ing] to the True File registry 126 for a True File entry record 140 for a corresponding True Name (Step S292)," and that the relevant mechanism is the "***Make True File Local***" mechanism. Ex. D, '791 IPR Dec., at 25-26 (citing '791 Patent, at 7:61-63, 17:10-23, Figure 1(b)). Indeed, the PTAB decision makes clear that a processor storing these data structures (including the True File Registry) is required "to implement the claimed function[]." *Id.* Thus, when programmed on the disclosed processor of Figure 1(b), Defendants' proposal of a processor that stores the True File Registry and executes the "Make True File Local" algorithm in Figures 17(a) and 17(b), to make a "local, accessible copy of the True File," is the complete and proper structure for performing the claimed function of "access means." *See* '791 Patent at 17:10–18.

### 2. "Data Associating Means …"

As with "access means," the parties agree on the proposed **function** ("**accessing a particular data item using the identifier of the data item**"), but disagree on the corresponding

20

structure. Defendants propose as an exemplary construction the following corresponding **structure**: "**The processor of Fig. 1(b), storing the True File Registry and programmed to execute the "Assimilate Data Item" primitive mechanism depicted in Figure 11.**"[24]

PersonalWeb again urges a construction that has already been rejected by the PTAB, and erroneously asks this Court to construe the corresponding structure for this limitation to include any one or more of a long list of mechanisms. *See* Pl. Op. Br. at 24; Ex. D, '791 IPR Dec., at 23-25. The parties agree that the claimed function for this means-plus-function limitation is "making and maintaining, for a data item in the system, an association between the data item and the identifier of the data item." Again, however, the PTAB construed the term under its "***broadest*** reasonable interpretation" to be "a data processor programmed according to the steps S230, S232, and S237-S239 illustrated in Figure 11." Ex. D, '791 IPR Dec. at 25.

As the PTAB noted, Figure 11 of the '791 Patent illustrates a mechanism for assimilating a data item into the True File registry. *See id.* at 24 (citing '791 Patent, at 14:41-43). The purpose of that mechanism "is to add a given data item to the True File registry, or if the data item already exists in the True File registry, discover and use the pre-existing data item before eliminating the duplicate." *Id.* (citing '791 Patent, at 14:43-47). Thus, the PTAB determined that the structure includes *at minimum* the relevant steps set forth in Figure 11 of the '791 Patent including "look[ing] for an entry for the True Name *in the True File registry* 126 (Step S232) and determin[ing] whether a True Name entry, record 140, exists *in the True File registry* 126." *Id.* at 24-25 (citing '791 Patent, at 14:51-60). Again, the PTAB makes clear that a processor storing these data structures (including the True File Registry) is required "to implement the

---

[24] EMC and VMware would have no objection to the Court, alternatively, adopting the PTAB's construction, which is consistent with the Defendants' proposed construction and specifically references steps S230, S232, and S237-S239 of Figure 11.

claimed function[]." *Id.* Thus, when programmed on the disclosed processor of Figure 1(b), Defendants' proposal of the "Assimilate Data Item" algorithm in Figure 11 is the complete and proper structure for performing the claimed function of "data associating means."

### 3. "Existence Means …"

The parties agree that the claimed **function** for this means-plus-function limitation is "**determining whether a particular data item is present in the system, by examining the identifiers of the plurality of data items**." HP and Autonomy contend that the "existence means" term is indefinite and the Court has granted permission for the filing of a separate motion on that issue. The remaining defendants who have proposed a construction agree that it is indefinite. To the extent the corresponding structure can be discerned at all, it should be construed as: "**the processor of Fig. 1(b), storing the True File Registry and programmed to execute the mechanism depicted in step S232 of Figure 11 and the "Locate Remote File" primitive mechanism depicted in Figures 16(a) and 16(b).**"[25]

The relevant claim (claim 1 of the '791 Patent) is directed to an "apparatus" that is part of a "data processing system." This apparatus includes the "existence means," which is responsible for determining whether a particular data item is present "in the data processing *system*" – *i.e.*, not merely whether the data item is present in a specific device, but instead it is present anywhere in the "data processing system" containing the device. The specification describes a primitive mechanism[26] – the "Locate Remote File" primitive shown in Figures 16(a) and 16(b) –

---

[25] All remaining defendants agree that the "Locate Remote File" primitive mechanism of FIGs. 16(a) and 16(b) is required structure, and NetApp proposes that the processor of FIG. 1(b) must also be programmed to execute step S232 of FIG. 11. EMC and VMware would have no objection to the Court, alternatively, adopting the PTAB's construction.

[26] "Primitive mechanisms provide fundamental capabilities used to support other mechanisms." '791 Patent at 6:25-26. Thus, higher level mechanisms, such as remote mechanisms, background mechanisms, and extended mechanisms all invoke primitive mechanisms in order to accomplish

that a device (*e.g.*, processor) can use to determine if the data item is present within other devices in the data processing system (*i.e.*, "remote" from the device). '791 Patent at 16:39-47. This mechanism is required structure for performing the function of "determining whether a particular data item is present ***in the system***" because it is the only thing in the specification that determines whether the data item is anywhere in the system (*i.e.* beyond just a specific device in the system).

The "True File Registry (TFR) 126" is also required structure for performing the function, which recites "determining . . . by examining the identifiers of the plurality of data items." The TFR 126 is a registry listing the identifier (known as a "True Name") for each registered data item, which are known as True Files. *Id.* at 8:27-30. The TFR "also stores ***location***, dependency, and migration information about True Files." *Id.* at 8:32-34 (emph. added). The TFR is required for "examining the identifiers of the plurality of data items" as recited in the claimed function and used by the Locate Remote File primitive mechanism (*see, e.g.,* step 290B of Fig. 16(b)) when determining if a True File exists remotely. PersonalWeb nonsensically argues the TFR is an unnecessary part of the structure by saying it is merely an input to the mechanisms that perform the recited function. Pl. Op. Br. at 24, 26. But it is unclear how any of PersonalWeb's structures could possibly "examine the identifiers" of data items without knowing the identifiers to be examined. The TFR is thus a necessary part of the structure, even under PersonalWeb's constructions. Significantly, the PTAB's construction of this term specifically includes step S232 – determining whether the True Name exists ***in the TFR*** – when applying the broadest reasonable interpretation in light of the specification. *See* Ex. D, '791 IPR Dec. at 21-22 (citing to specification and emphasizing utilization of the TFR).

In addition to the above structure, NetApp asserts that in order for a device to determine

their specified tasks within the disclosed system.

whether a particular data item is present "in the system," that device must look not just remotely (using the "Locate Remote File" primitive) but also locally within its own storage. Without also performing a local check, the apparatus cannot determine definitively "whether a particular data item is present in the system" (*i.e.*, the device may conclude a data item is nowhere in the system even though the item exists locally in the system). Therefore, NetApp also identifies structure for performing this local determination, specifically step S232 of Fig. 11, which is also identified by PersonalWeb.[27] PersonalWeb's construction identifies structure in the disjunctive – requiring only a local or a remote search (but not both) – and is therefore inadequate for performing the full breadth of the function of "determining whether a particular data item is present *in the system.*" Therefore, the structure corresponding to the recited function requires a processor that is programmed to perform both a local search (*e.g.*, step S232 of Fig. 11) *and* a remote search (*i.e.*, the Locate Remote File primitive mechanism).

### 4. "Local Existence Means …"

In the JCCS, the parties agreed that the function of the "local existence means" is "**determining whether an instance of a particular data item is present at a particular location in the system, based on the identifier of the data item**."[28] The parties dispute the corresponding **structure**. HP and Autonomy maintain that the "local existence means" term is

---

[27] Step 232 is a local check for the existence of the data item. Several disclosed processes utilize a local check, for example step S260 of Fig. 14 set forth in PersonalWeb's identified structure. NetApp would agree to the identification of any one of these local check steps as corresponding structure as long as the construction is clear that both a "remote" and a "local" check must be performed in order to determine whether the particular data item is present *in the system*.

[28] PersonalWeb incorrectly identifies the agreed-upon function in Exhibit 2 of its Opening Brief. The construction represented by PersonalWeb in the JCCS as "agreed," compared to what PersonalWeb stated in its brief, is: "Determining whether an instance of a particular data item is present at a particular location in the system, by examining based on the identifier~s~ of the plurality of data item~s~." *Compare* Pl. Op. Br., Ex. 2, at 23, *with* JCCS, Ex. B at 46-48. The function as stated by Defendants properly tracks the language of the claims. *See Lockheed Martin v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).

indefinite and the Court has granted permission for the filing of a separate motion on that issue. The remaining defendants who have proposed this term for construction agree that it is indefinite. To the extent the corresponding structure can be discerned at all, it should be construed: "**The processor of Fig. 1(b), storing the True File Registry and programmed to execute the "Locate True File" remote mechanism depicted in Figure 28**."[29]

Claim 2 is representative of the dispute, and recites the "apparatus as in claim 1, ***further comprising*** . . . local existence means . . . ." As a threshold matter, claim 2 on its face requires the apparatus of claim 1 to include something in addition to the "existence means" that is part of the apparatus of claim 1. PersonalWeb proposes a construction for "local existence means" that is subsumed within its proposed construction for "existence means." In contrast, Defendants' proposed construction for this term properly harmonizes the "existence means" recited in claim 1 with the "local existence means" recited in the dependent claims.

Per claim 1, the apparatus already includes an "existence means" that determines if a particular data item exists anywhere "in the system." The function of the "local" existence means – "determining whether an instance of a particular data item is present at a particular location in the system" – must, therefore, correspond to the ability of the apparatus to respond to requests from other apparatuses in the system.

Defendants' construction – which coordinates the functions of the "existence means" and the "local existence means" – is supported by the specification. The specification discloses the "Locate True File" mechanism (in connection with Fig. 28) as the mechanism by which an individual processor can respond to requests from another processor that is trying to determine the presence of a True File (*e.g.*, another processor with "existence means" as described above).

---

[29] EMC and VMware would have no objection to the Court, alternatively, adopting the PTAB's construction.

With this mechanism, the local processor receives a request from a remote processor to determine whether that local processor contains a copy within its local storage of a requested True File. '791 Patent at 23:53-58. In response to the request, the local processor checks locally to make the determination and responds either affirmatively, negatively, or alternatively (depending on the setting of a flag) forwards the request along to another server. '791 Patent at 23:53-24:28; Fig. 28.

PersonalWeb nonetheless argues that the True File Registry is not part of the corresponding structure. Pl. Op. Br. at 28-29. As with the "existence means," however, the True File Registry (TFR) is required structure for performing the function of the "local existence means," and the PTAB expressly referenced the TFR in its discussion of the required structure. *See* Ex. D, '791 IPR Dec. at 23 ("[T]he Specification of the '791 patent uses the data structures [*i.e.*, the TFR] stored in the memory of a data processor to implement the claimed functions . . . which confirms that the True Name exists locally by searching for it in the True Name registry… ."). Therefore, the TFR is required for a determination whether a data item is present "based on the identifier of the data item" and the Locate True File remote mechanism uses the TFR when it determines if a True File exists at a particular location in the system. *See* '791 Patent at 23:59-62; Fig. 28 (step S432).

Finally, PersonalWeb's construction must be rejected because it would conflate the "existence means" of claim 1 with the additional "local existence means" of dependent claims 2 and 3, rendering the dependent elements nullities. PersonalWeb does not hide this, as it improperly characterizes the dispute concerning "existence means" and "local existence means" as being "essentially the same," and relies on the same passages from the '791 Patent to support its constructions. *See* Pl. Op. Br. at 25 and 28 (citing to '791 Patent at 3:35-39). Indeed, its

analyses of the two terms are virtually identical.  The result is that PersonalWeb's construction of "local existence means" (claims 2 and 3) is redundant of and subsumed within its construction of "existence means" (claim 1) and cannot be reconciled with the basic rule that different terms (particularly when they appear in dependent claims) must have a different meaning.  This is particularly true here given the requirements of claim 2 and 3 that they are "apparatus as in claim 1, further comprising" the local existence means element.

### 5.  "Identity Means …"

The parties dispute *both* the recited function and structure for this means-plus-function claim term.  Defendants' proposed **function**[30] not only faithfully tracks all the claim language in the above limitation after "identity means for" but is identical to the function that PersonalWeb identified (and the PTAB adopted) in the copending IPR of the '791 Patent.  *See* Ex. C, '791 IPR Prelim. Resp. at 7 (setting forth the "Correct Function" for "identity means").  PersonalWeb identifies an abbreviated function in this Court, cleaving the claim language after "determining . . . a substantially unique identifier." .  *See* Pl. Op. Br. at 27.  Abbreviating the function in this manner is improper as a matter of law.  "The function of a means-plus-function claim must be construed to include the limitations contained in the claim language."  *Lockheed Martin*, 324 F.3d at 1319.  Because PersonalWeb improperly omits most of the recited function, the Court should reject it and adopt the function proposed by Defendants.

PersonalWeb also misidentifies the corresponding structure in the specification to the extent it does not require the use of the MD4, MD5 or SHA algorithms.  The Defendants' proposed **structure** is:  "**The processor of Fig. 1(b), programmed to execute the "Calculate**

---

[30] Defendants' proposed function:  "**Determining, for any of a plurality of data items present in the system, a substantially unique identifier, the identifier being determined using and depending on all of the data in the data item and only the data in the data item, whereby two identical data items in the system will have the same identifier**."

**True Name" primitive mechanism depicted in Figures 10(a) and 10(b), where the MD function is one of the MD4, MD5 and SHA functions.**"[31]  In that regard, the parties agree that the corresponding structure in the specification is a processor programmed to perform the Calculate True Name primitive.  *See* JCCS, Ex. B, at 43-46 and Pl. Op. Br. at 27.  The only disclosed algorithms used by that primitive are the MD4, MD5 and SHA algorithms.  '791 Patent at 13:10-19.  Therefore, the Court should make clear in its construction that these algorithms are part of the corresponding structure.[32]

PersonalWeb's construction concedes that the Calculate True Name primitive is required structure, but attempts in its brief to divorce that primitive from FIG. 10(b).  *Compare* JCCS, Ex. B, at 43 (citing to '791 Patent at 14:1-39) and Pl. Op. Br. at 27-28.  However, the Patents-in-Suit describe this primitive with reference to FIGS. 10(a) *and* 10(b).  *See* '791 Patent at 14:1-31.  That the primitive is defined by FIGS. 10(a) and 10(b) is confirmed by the IPR, where PersonalWeb relied on aspects of both FIGS. 10(a) and 10(b) – including the determination of whether a data item is simple or compound and the subsequent processing based on that determinations – to distinguish the recited "identity means" from the Woodhill art:

> This means-plus-function clause [identity means] ***requires*** a mechanism determining if the data item is a simple or compound data item, and when it is a compound data item then applying a MD4, MD5 or SHA hash function (***performed in computing a True Name***) to each of the segments of the compound data item to obtain a True Name for each of the segments (and equivalents thereof).  This clause ***further requires*** creating a block consisting of the respective True Names of the plurality of segments, and then applying the hash function (***performed in computing a True Name***) to the block of segment True Names in order to compute the True Name of the compound data item (and

---

[31] EMC and VMware would have no objection to the Court, alternatively, adopting the PTAB's construction.

[32] PersonalWeb's argument that Calculate True Name consists of a "family of functions" beyond MD4, MD5 and SHA is not supported by the intrinsic record.  The specification states that the "family of functions" includes only MD4, MD5 and SHA. '791 Patent at 13:10-14.  The specification discloses no alternative algorithms.

equivalents thereof). Thus, for example, the claim *requires* a hash of hashes when it is determined that the data item is a compound data item. As explained below, Woodhill fails to disclose these features or any equivalent thereto.

Ex. C, '791 IPR Prelim. Resp. at 37 (emph. added). The Court should adopt Defendants' construction of "identity means" in view of these specific prosecution history statements and disclaimers.[33]

### C. Additional Terms

#### 1. "Data Item(s)"

Although the Defendants have proposed slightly different wording in the JCCS, Defendants' exemplary proposed construction is: "**the contents of a file, a portion of a file, a page in memory, an object in an object-oriented program, a digital message, a digital scanned image, a part of a video or audio signal, or any other similar entity which can be represented by a sequence of bits**."[34]

PersonalWeb argues, on the one hand, that the applicants acted as lexicographers, and, on the other, that the construction of "data item" should not be bound by the applicants' own definition (Pl. Op. Br. at 14-15), which is:

> In general, the terms "data" and "data item" as used herein refer to sequences of bits. Thus a *data item may be the contents of a file, a portion of a file, a page in memory, an object in an object-oriented program, a digital message, a digital scanned image, a part of a video or audio signal, or any other entity which can be represented by a sequence of bits*.

'791 Patent at 1:54-60 (emph. added); *see also* Ex. A, '791 File History, Mar. 12, 1997 Amend.

---

[33] NetApp's construction incorporated PersonalWeb's IPR statements characterizing the requirements of FIGS. 10(a) and 10(b) as part of the recited "identity means" (JCCS, Ex. B, at 45-46), but NetApp is agreeable to the Defendants' construction set forth above, which incorporates these characterizations by express reference to FIGS. 10(a) and 10(b).

[34] EMC and VMware would have no objection to the Court, alternatively, adopting the PTAB's construction which is consistent with the Defendants' proposed construction. Microsoft and Yahoo! note that the reference to "data item" throughout claim 30 must be the same data item; otherwise, the claim would be impermissibly indefinite.

B, at 11-12 (citing same to describe "data item").

Defendants' proposal remains true to the specification by incorporating the content-based nature of the purported invention ("the contents of …") and using nearly the exact language that the applicants used to define the term "data item" ("… a file, a portion of a file, a page in memory, an object in an object-oriented program, a digital message, a digital scanned image, a part of a video or audio signal, or any other similar entity which can be represented by a sequence of bits").[35]  The open-ended list of items clarifies that a "data item" must be an ***item*** – that is, a discrete object – rather than an unbounded "sequence of bits" as PersonalWeb proposes. Inclusion of the "any other similar entity" language means that the list is not overly-restrictive, as PersonalWeb would have the Court believe (Pl. Op. Br. at 15-16), while also ensuring that PersonalWeb cannot, through an aggressive interpretation of the claim construction, recapture data that the applicants taught cannot form the basis of a substantially unique identifier, such as a file name, location or address.

> ## 2.      "Data File(s)" and "Files"

Defendants' exemplary proposed construction is:  "**a named data item that appears in a directory in a file system and which is a data file**."

Before the PTAB and throughout the parties' claim construction exchanges, PersonalWeb advocated a construction that was substantially similar to that proposed by Defendants.  *See* Ex. F, '280 IPR Prelim. Resp., at 3-4 ("a named data item that appears in a directory and which is a data file (which may be simple or compound)"; "The correct construction for this term is set forth above"); JCCS Ex. B, at 8 ("a named data item that appears in a directory (collection) and which is a data file (which may be simple or compound)").  PersonalWeb does not explain why it

---

[35] The only difference from the specification is use of the word "similar" in the phrase " … any other similar entity."

now deviates from its prior positions, and it continues to rely upon the portion of the specification that supports ***Defendants'*** proposed construction:

> In other words, a file system 116 is a collection of directories 118. A directory 118 is a collection of named files 120 – both data files 120 and other directory files 118. A file 120 is a named data item which is either a data file (which may be simple or compound) or a directory file 118. A simple file 120 consists of a single data segment 122. A compound file 120 consists of a sequence of data segments 122. A data segment 122 is a fixed sequence of bytes.

'791 Patent at 5:44-52; Pl. Op. Br. at 17 (citing same).

As this excerpt confirms, the specification defines a "data file" not only as a "named data item" but also as part of a collection of named files (a "directory") that is part of a collection of directories (a "file system"). *See* '791 Patent at Fig. 2, 5:44-52; *see also id*. at 1:31-34 ("… users and programs are able to create and use collections of named data items, these collections themselves being named by identifiers"); *id*. at 1:35-37 ("an [operating system] may provide mechanisms to group files (data items) into directories (collections)."). A "data file" thus has a particular context, which makes sense in view of the purported invention that translates the traditional ***context-based*** approach to file identification (*i.e.*, user-given file name and file path) into a ***content-based*** approach (*i.e.*, identifier generated by applying an algorithm to all of the file's content). '791 Patent at 2:3-7 ("the file identified by a particular file name can only be determined when the directory containing the file (the context) is known. The file identified by a pathname can be determined only when the file system (context) is known."); '280 Patent at claims 18, 54 ("for a particular data file having a particular name specifying a location in the network at which the data file may be located …"). Defendants include the complete lexicography, including the context, in their proposed construction.

The second dispute concerns the parties' disagreement over what it means to be a "file." The True Names Patents use various "file" terms interchangeably. '791 Patent at 5:46-48, 50-51

(named files 120; data files 120; file 120; simple file 120; compound file 120). But while a "file" (or "data file") is a specific type of data item – a named data item in a directory in a file system – the specification is clear that a "data item" is not (necessarily) a "file." *Id.* at 1:50-53, 1:55-60 (describing a "data item" as the contents of a file or portion of a file, among others); *id.* at 6:8-10, 14:48-49, 17:13-14 (listing a file separately from a data item). PersonalWeb blurs the distinction between a "data file" and a "data item," even though the specification makes plain that "file" as used in the True Names Patents is an actual file, *i.e.*, that used in a "typical, familiar file system," and not just any data segment, as PersonalWeb proposes. '791 Patent at 6:47-50, 6:55-64 (describing file operations such as open file, close file, read file, write file, delete file); *see also id.* at 5:28-29 (listing "data files" separate from "segments"), 6:9-10 ("… actual file, segment, *or* data item") (emphasis added). Indeed, the specification teaches that a "segment" cannot be named, which even PersonalWeb recognizes is a requirement for a "data file." *Id.* at 5:42-43 ("Usually the lowest level elements, in this case segments 122, cannot be named by users.").[36]

Defendants' proposal is consistent with the specification, whereas PersonalWeb's is not. Defendants respectfully request that the Court adopt their proposed construction for "data file."

---

[36] The third dispute concerns the specification's teaching that a "data file" may be "simple or compound." Defendants propose incorporating this exact language into the claim construction (*i.e.*, "… a data file (which may be simple or compound)"). PersonalWeb, however, attempts to broaden the specification's teaching by eliminating the requirement that a "compound file" "consists of a ***sequence*** of data segments" where each data segment is a ***fixed*** sequences of bytes ('791 Patent at 5:51-52) that do not overlap another. *Id.* at Fig. 2 at [22]; *see also* Ex. G, '280 IPR Dec. at 11 (a simple file includes "a single, fixed sequence of data bytes" while a compound file "includes multiple, fixed sequences of data bytes").

### 3. "File System"

PersonalWeb's argument that "file system" needs no construction (Pl. Op. Br. at 18) ignores the express definition of this term in the specification:[37]

> In other words, a file system 116 is a collection of directories 118. A directory 118 is a collection of named files 120 – both data files 120 and other directory files 118.

'791 Patent at 5:44-52; Pl. Op. Br. at 17 (citing same). The Defendants' exemplary proposed construction – "**a collection of directories, which each include a collection of named files**" – is consistent with this express definition and confirms that each directory in the "collection of directories" making up the file system is made up of a collection of named files.[38]

PersonalWeb attempts to create an artificial dispute in its Brief, stating that Defendants' use of the word "include" in their proposed construction somehow "makes 'directory' and 'collection of named files' two different things" or "separates directory into some undefined entity." Pl. Op. Br. at 19. To the contrary, Defendants' proposal does not imply that a "directory" may include items other than named files, but rather provides that a "directory" contains only named files. This is entirely consistent with the specification's teaching that "a directory *is* a collection of named files."

---

[37] PersonalWeb argues that "several of the Defendants appear to agree with PersonalWeb" that "file system" need not be construed. Pl. Op. Br. at 18. This is patently untrue. Of the 90 claims asserted in the serially-filed cases, "file system" appears only in certain claims of the '662 and '096 Patents. Those claims are not asserted against all Defendants; thus, Defendants in three cases do not join in the briefing as to "file system." Two additional Defendant groups take no position at all as to the meaning of "file system." JCCS, Ex. B, at 12-13.

[38] PersonalWeb admits in its Brief that the specification specifically defines the term "file system" as "a collection of directories," and then further defines "directory" as a "collection of named files." Pl. Op. Br. at 19. PersonalWeb criticizes Defendants, without explanation, for including the word "each" in their proposed construction, *id.*, but there does not appear to be a real dispute on this point. Both sides agree that a "file system" is "a *collection* …," which necessarily requires more than one "directory."

### 4. "Sufficient Number of Copies"

Defendants' proposed construction – "**a preset number of copies greater than or equal to 2 of different locations in which a file is stored**" – is consistent with the intrinsic record. *First*, the claim language itself dictates Defendants' construction. Specifically, claim 1 of the '662 patent ties the number of copies to "a predetermined degree of redundancy" – and copies at a single location are not redundant. *Second*, Defendants' proposed construction is consistent with the specification, which describes sufficient copies as keeping multiple copies spread over multiple locations. *See* '662 Patent at 34:31–33 ("A DP system employing the present invention can be made into a fault-tolerant system by providing a certain amount of redundancy of data items at multiple locations in the system."); *id*. at 34:40–45 ("Any degree of redundancy (limited by the number of processors or locations in the system) can be implemented. As a result, this invention maintains a desired degree or level of redundancy in a network of processors, to protect against failure of any particular processor by ensuring that multiple copies of data items exist at different locations."). *Third*, the prosecution history likewise supports Defendants' proposed construction. *See, e.g.*, Ex. K, '662 File History, Dec. 29, 2008 Amend. Filed with Request for Continued Examination at 13–14 ("Independent claim 57, as amended, recites a deletion method, operable in a data processing system in which *multiple copies* of a data item may be present …") (emph. added). Even the quote from the specification on which PersonalWeb bases its alternate construction for this term – "application-specific *migration/archival* criteria" – indicates multiple copies, as migrating or archiving a data item necessarily requires at least two copies of the data item. '662 Patent at 26:4–8 (emphasis added). Accordingly, Defendants' proposed construction should be adopted.

### 5. "Licensed" and "Unlicensed"

As the applicants expressly state in the title of the '442 Patent ("Enforcement and Policing of Licensed **Content** Using Content-Based Identifiers"), it is a particular piece of **content** stored in the system that is "licensed." Defendants' proposed construction ("**having a license to content stored within a requested file**") correctly reflects what is licensed.[39] PersonalWeb's "plain meaning" interpretation as applied in its infringement contentions and its alternative construction, "with license/without license," rewrites the claim to require only general authorization to access the system as a whole, rather than rights to "licensed content" as the patent describes and the claims require.

The plain language of the claims supports Defendants' construction that what is licensed is content in a particular file using a "content-based identifier." For example, claim 1 of the '442 patent requires that "a *copy of the requested file* is only provided to **licensed parties**." '442 patent at 39:50-2; *see also* '442 patent, claim 7 at 40:34-36. Thus, the claim itself indicates that the invention differentiates between licensed and unlicensed parties on a per-file basis. Dependent claim 3 refers back to the requested file of claim 1 and makes clear that the required license rights are for the specific file that is requested. "A method as in claim 1 further comprising: determining, using at least the name, whether an unauthorized or **unlicensed copy of the data file** is present on a particular one of said computers." '442 Patent at 39:58-61. Claim 31 similarly requires "recording information about the computer and about the unauthorized or **unlicensed content**." *Id.* at 42:53-54.

The specification explains that what is licensed is specific content, *e.g.*, a particular file,

---

[39] Amazon is adopting its construction from the Joint Claim Construction Chart, JCCS Ex. B at p. 33: "having a license to content stored within a requested file." HP, Autonomy, NECAM, EMC and VMware have proposed "provided with a license to content stored within a requested file." JCCS, Ex. B at 33-34.

not access to the system as a whole. "A copy of a requested file is only provided to licensed (or authorized) parties. The system may check one or more computers for unauthorized or **unlicensed content**." Abstract. "This mechanism ensures that **licensed files** are not used by unauthorized parties." '791 Patent at 32:18-19. The patent explains that licenses are tracked per data item and per user in a license table. "Each record 150 of the license table 136 records a relationship between a licensable data item and the user licensed to have access to it." *Id.* at 11:63-65. Every mention of licenses in the specification refers to licenses to individual files or pieces of content. Nowhere does the patent use the term "license" to refer to the mere ability to access the system or data within it. *See id.* at 32:23-47. The file history and re-examination file history similarly confirm Defendant's proposed construction relating the licensing to content, *i.e.* files or data. *E.g.*, Ex. H, '442 File History, May 28, 2004 Amend. at 26; Ex. I, '442 Reexamination File History, July 30, 2009, at 11.

PersonalWeb's assertion that Defendants' construction is inconsistent with the patent's description of "passive" license enforcement (Pl. Op. Br. at 21) is wrong. In fact, the patent's description of "passive" license enforcement confirms Defendant's construction that specific data items, rather than users or systems, are licensed (or not). As described in the specification, "active" enforcement is where a user is blocked from using a particular file, whereas "passive" enforcement simply creates a list of users accessing files that are not licensed or authorized for their use. '791 Patent at 23:23-27. To determine whether a file is licensed to a particular user, the file's True Name is compared against True Names in a license table. *Id.* at 32:27-48. The patent's description of "passive" license enforcement confirms that particular content is "licensed" and that a user may access the system and even copy files without being a "licensed party."

Defendants' construction is true to the meaning of the term "licensed" when viewed in the "context of the entire patent." *Phillips*, 415 F.3d at 1323. Therefore, the Court should adopt Defendants' construction, "[not] having a license to content stored within a requested file."

### 6. "Distributing a Set of Data Files Across a Network of Servers"

The claims in which the phrase "distributing a set of data files across a network of servers" appear (claims 10, 15, 16, 25 and 31 of the '280 Patent) are directed to a "content delivery method" in which files across a network of servers are provided in response to a request. Consistent with the plain language of these claims, the phrase "distributing a set of data files across a network of servers" requires, as Defendants propose, "**delivering a set of data files to two or more servers in a network of servers**." That the claims are directed to a "content delivery method" necessarily requires that the content – in this case a set of data files – be *delivered*. And the language "network of servers" requires that the content be delivered to *two or more servers*.

During prosecution of the '280 patent, the applicants specifically pointed to the "Mirror True File Mechanism" as support for the relevant claims of the '280 Patent, which the examiner had rejected as lacking written description. Ex. E, '280 File History, Aug. 22, 2001, Resp. at 27-28. The specification describes that the Mirror True File Mechanism is "used to ensure that files are available in alternate locations in mirror groups or archived on archival servers." '791 Patent at 26:21-40. For the redundancy of the Mirror True File Mechanism to exist, there must be copies of files located on multiple servers. Accordingly, "distributing a set of data files across a network of servers" must involve two or more servers.

Although PersonalWeb contends that "distributing a set of data files across a network of servers" has an ordinary meaning that requires no construction, it offers an alternative construction that belies this claim. PersonalWeb' s proposed alternative construction makes

clear that absent a construction, PersonalWeb intends to interpret the phrase in a manner that does not reflect the plain meaning of the phrase and is inconsistent with the specification and the '280 Patent prosecution history.  As such, there is now a genuine dispute among the parties concerning the meaning of this term, and this dispute should be resolved rather than this term being given merely its plain and ordinary meaning.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of [the] claims, the court, not the jury, must resolve that dispute.").

PersonalWeb' s alternative construction impermissibly seeks to expand the scope of its claims to encompass delivery of a set of data files to a single server.  *See* Pl. Op. Br. at 21. PersonalWeb's sole argument in favor of its construction is that the construction Defendants propose would exclude a disclosed embodiment – a peer-to-peer configuration – from the claims. (*See Id.*)  But there is no rule of claim construction requiring that every disclosed embodiment be encompassed within the scope of a given claim.  In fact, the law is to the contrary.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed. Cir. 2008) (construing claims to exclude disclosed embodiments).  Furthermore, the particular embodiment that PersonalWeb now points to as support for its construction is entirely different from the embodiment the applicants identified during the prosecution of the '280 Patent as supporting the relevant claims – the Mirror True File Mechanism.  Ex. E, '280 File History, Aug. 22, 2001, Resp. at 27-28.

PersonalWeb also impermissibly attempts to redefine the phrase by construing the word "distributing" to mean merely "storing."  Not only does the intrinsic evidence not support this construction, but it is also directly contrary to the preamble of the relevant claims, which state that the claim is directed to a method for "content **delivery**."  *See* '280 Patent claim 10; *see also*

'280 Patent abstract. Moreover, "storage" and "distribution" are distinct concepts, as other claims, such as claim 26 of the '096 Patent (a continuation of the '280 Patent with an identical specification), make clear. Claim 26 recites a list of twelve distinct kinds of "access" to a data item, including as separate items "***distributing*** the particular data item" and "***storing*** the particular data item." *See* '096 Patent claim 26. Accordingly, PersonalWeb's attempt to conflate "distributing" with "storing" should be rejected, and this term should be construed, as Defendants propose, as relating to content delivery.

## IV.  CONCLUSION

Defendants' proposed claim constructions should be adopted.

Dated:  June 24, 2013                        Respectfully submitted,

Case No. 11-cv-00655            By:  */s/ Matthew J. Hertko*
                                     Eric H. Findlay
                                    FINDLAY CRAFT
                                    6760 Old Jacksonville Highway, Ste. 101
                                    Tyler, TX  75703
                                    Phone:  903-534-1100
                                    Fax:  903-534-1137
                                    EFindlay@FindlayCraft.com

                                    William E. Devitt, P.C.
                                    Matthew J. Hertko
                                    KIRKLAND & ELLIS LLP
                                    300 N. LaSalle St.
                                    Chicago, IL  60654
                                    Phone:  312-862-2000
                                    Fax:  312-862-2200
                                    william.devitt@kirkland.com
                                    matthew.hertko@kirkland.com

                                    *Attorneys for Defendant*
                                    *NEC Corporation of America, Inc.*

Case No. 11-cv-00656            By:  */s/ Sara P. Zogg*
                                    Michael E. Jones
                                    State Bar No. 10929400
                                    Allen F. Gardner
                                    State Bar No. 24043679
                                    **POTTER MINTON P.C.**
                                    110 N. College Avenue, Suite 500
                                    Tyler, TX 75702
                                    Phone: (903)-597-8311
                                    Fax: (903)-593-0846
                                    mikejones@potterminton.com
                                    allengardner@potterminton.com

                                    Michael A. Berta (admitted *pro hac vice*)
                                    **ARNOLD &PORTER LLP**
                                    Three Embarcadero Center, 7th Floor
                                    San Francisco, CA 94111
                                    Phone: (415) 471-3100
                                    Fax: (415) 471-3400
                                    michael.berta@aporter.com

Nicholas H. Lee (admitted *pro hac vice*)
**ARNOLD &PORTER LLP**
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Phone: (213) 243-4000
Fax: (213) 243-4199
nicholas.lee@aporter.com

Sara P. Zogg (admitted *pro hac vice*)
**ARNOLD &PORTER LLP**
555 Twelfth Street, NW
Washington, DC 20004
Phone: (202) 942-5000
Fax: (202) 942-5999
sara.zogg@aporter.com

ATTORNEYS FOR DEFENDANTS
GOOGLE INC. and YOUTUBE, LLC

Case No. 11-cv-00657          By: */s/ Jarrad M. Gunther*
Jarrad M. Gunther
DUANE MORRIS LLP
L. Norwood Jameson (admitted)
GA Bar No. 003970
wjameson@duanemorris.com
Matthew C. Gaudet (admitted)
GA Bar No. 287789
mcgaudet@duanemorris.com
Jennifer H. Forte (admitted)
GA Bar No. 940650
jhforte@duanemorris.com
1075 Peachtree Street
Suite 2000
Atlanta, GA 30309-3929
404.253.6900
404.253.6901 (facsimile)

Joseph A. Powers
japowers@duanemorris.com
Jarrad M. Gunther (admitted *pro hac vice*)
jmgunther@duanemorris.com
40 South 17th Street
Philadelphia, PA 19103
215.979.1000
215.979.1020 (facsimile)

Robert Christopher Bunt
PARKER, BUNT & AINSWORTH, PC
State Bar No.  00787165
rcbunt@pbatyler.com
100 East Ferguson
Ste. 1114
Tyler, TX 75702
(903) 531-3535
(903) 533-9687 (facsimile)

*Attorneys for Defendant NetApp, Inc.*


Case No. 11-cv-00658                    By: */s/ J. David Hadden*
                                        J. David Hadden (CA Bar No. 176148)
                                        (Admitted E.D. Texas)
                                        Darren E. Donnelly (CA Bar No. 194335)
                                        (Admitted E.D. Texas)
                                        David Schumann (CA Bar No. 223936)
                                        (Admitted E.D. Texas)
                                        Ryan Tyz (CA Bar No. 234895)
                                        (Admitted E.D. Texas)
                                        Phillip J. Haack (CA Bar No. 262060)
                                        (Admitted E.D. Texas)
                                        **FENWICK & WEST LLP**
                                        801 California Street
                                        Mountain View, CA 94041

                                        Jennifer Haltom Doan
                                        Texas Bar No. 08809050
                                        Darby Vincent Doan
                                        Texas Bar No. 00793622
                                        **HALTOM & DOAN**
                                        6500 Summerhill Road, Ste. 100
                                        Texarkana, TX  75503
                                        Telephone: (903) 255-1000
                                        Facsimile: (903) 255-0800
                                        Email: jdoan @haltomdoan.com
                                        Email: ddoan@haltomdoan.com

                                        *Attorneys for Defendants*
                                        *Amazon.com, Inc. and Amazon Web Services, LLC*

Case No. 11-cv-00660     By:     */s/ Michael E. Jones*               

Michael E. Jones
Potter Minton P.C.
110 North College, Suite 500
Tyler, TX 75702
903-525-2239
mikejones@potterminton.com

OF COUNSEL:

William F. Lee
Cynthia D. Vreeland
Anna E. Lumelsky
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Robert Galvin
Cortney C. Hoecherl
WILMER CUTLER PICKERING HALE
AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
(650) 858-6000

*Attorneys for Defendants and Counterclaim-Plaintiffs EMC Corporation and VMware, Inc*

Case No. 11-cv-00683     By: */s/ Bijal v. Vakil*              

J. Thad Heartfield
Texas Bar No. 09346800
**THE HEARTFIELD LAW FIRM**
2195 Dowlen Road
Beaumont, Texas 77706
Phone: (409) 866-3318
Fax: (409) 866-5789
thad@jth-law.com

Bijal V. Vakil
CA State Bar No.: 192878
(Admitted to practice in the Eastern District of Texas)

**WHITE &CASE, LLP**
3000 El Camino Real
Five Palo Alto Square 9th Floor
Palo Alto, CA 94306
Phone: (650) 213-0300
Fax: (650) 213-8158
bvakil@whitecase.com

Attorneys for Defendant
AUTONOMY, INC.


Case No. 11-cv-00683        By: _/s/ Paul Alexander,_____
                                 Michael E. Jones
                                 State Bar No. 10929400
                                 Allen F. Gardner
                                 State Bar No. 24043679
                                 **POTTER MINTON P.C.**
                                 110 N. College Avenue, Suite 500
                                 Tyler, TX 75702
                                 Phone: (903)-597-8311
                                 Fax: (903)-593-0846
                                 mikejones@potterminton.com
                                 allengardner@potterminton.com

                                 Paul Alexander (admitted *pro hac vice*)
                                 **ARNOLD & PORTER LLP**
                                 1801 Page Mill Road, Suite 110
                                 Palo Alto, CA 94304
                                 Phone: (650) 798-2921
                                 Fax: (650) 798-2999
                                 paul.alexander@aporter.com

                                 Attorneys for Defendants
                                 HEWLETT-PACKARD COMPANY and
                                 HP ENTERPRISE SERVICES, LLC


Case No. 12-cv-00658        By: _/s/  Kevin S. Kudlac_____
                                 Jared Bobrow
                                 California State Bar No. 133712
                                 Andrew L. Perito
                                 California State Bar No. 269995
                                 WEIL GOTSHAL & MANGES LLP
                                 201 Redwood Shores Parkway
                                 Redwood Shores, CA 94065

Telephone: (650) 802-3034
Facsimile: (650) 802-3100
jared.bobrow@weil.com
andrew.perito@weil.com

Kevin S. Kudlac
State Bar No. 00790089
Amber L. Hagy
State Bar No. 09223750
Joshua P. Davis
State Bar No. 24059656
Rene A. Trevino
State Bar No. 24051447
Rodney R. Miller
State Bar No. 24070280
WEIL GOTSHAL & MANGES LLP
700 Louisiana St., Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
kevin.kudlac@weil.com
amber.hagy@weil.com
joshua.davis@weil.com
rene.trevino@weil.com
rodney.miller@weil.com

Jennifer H. Doan
Stephen W. Creekmore
HALTOM &DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800
jdoan@haltomdoan.com
screekmore@haltomdoan.com

**COUNSEL FOR DEFENDANT
YAHOO! INC.**

Case No. 12-cv-00660        By: */s/* Michael D. Jay _____
                            Melissa R. Smith
                            State Bar No. 24001351
                            GILLAM & SMITH, LLP
                            303 S. Washington Ave.
                            Marshall, Texas 75670

Telephone:  (903) 934-8450
Facsimile:  (903) 934-9257
melissa@gillamsmithlaw.com

David Boies (*pro hac vice* pending)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street, Armonk, NY 10504
Telephone:  (914) 749-8200
Facsimile:  (914) 749-8300
dboies@bsfllp.com

Michael D. Jay (admitted *pro hac vice*)
Bill Ward (admitted *pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA 90401
Telephone:  (310) 393-9119
Facsimile:  (310) 395-5877
mjay@bsfllp.com
bward@bsfllp.com

*Attorneys for Apple Inc.*

Case No. 12-cv-00662    By: */s/ Heidi L. Keefe*
                            Deron R. Dacus
                            Texas Bar No. 00790553
                            **THE DACUS FIRM, P.C.**
                            821 ESE Loop 323, Suite 430
                            Tyler, TX 75701
                            Phone: (903) 705-1117
                            Fax: (903) 705-1117
                            ddacus@dacusfirm.com

                            Heidi L. Keefe (CA Bar 178960)
                            Mark R. Weinstein  (CA Bar 193043)
                            Brian P. Wikner (CA Bar 244292)
                            Lam K. Nguyen (CA Bar 265285)
                            **COOLEY LLP**
                            Five Palo Alto Square
                            3000 El Camino Real
                            Palo Alto, CA  94306-2155
                            Telephone: (650) 843-5000
                            Facsimile:  (650) 857-0663
                            Email: hkeefe@cooley.com
                            Email: mweinstein@cooley.com

Email: bwikner@cooley.com
Email: lnguyen@cooley.com

**ATTORNEYS FOR
DEFENDANT FACEBOOK, INC.**


Case No. 12-cv-00663         By: */s/ Kevin S. Kudlac*_____

Jared Bobrow
California State Bar No. 133712
Andrew L. Perito
California State Bar No. 269995
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3034
Facsimile: (650) 802-3100
jared.bobrow@weil.com
andrew.perito@weil.com

Kevin S. Kudlac
State Bar No. 00790089
Amber L. Hagy
State Bar No. 09223750
Joshua P. Davis
State Bar No. 24059656
Rene A. Trevino
State Bar No. 24051447
Rodney R. Miller
State Bar No. 24070280
WEIL GOTSHAL & MANGES LLP
700 Louisiana St., Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
kevin.kudlac@weil.com
amber.hagy@weil.com
joshua.davis@weil.com
rene.trevino@weil.com
rodney.miller@weil.com

Jennifer H. Doan
Stephen W. Creekmore
HALTOM &DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503

Telephone: (903) 255-1000
Facsimile: (903) 255-0800
jdoan@haltomdoan.com
screekmore@haltomdoan.com

**COUNSEL FOR DEFENDANT
MICROSOFT CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 24, 2013, a true and correct copy of the foregoing was filed via the Court's ECF system, which will provide notice to all counsel of record.

*/s/ Phillip J. Haack*
Phillip J. Haack